AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Eastern District of Missouri

IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH **APPLE ID:** **monarchdsachdev@icloud.com** THAT IS STORED AT PREMISES CONTROLLED BY APPLE, INC.

)
)
)
)
)
)

**FILED UNDER SEAL**

4:25 MJ 6200 PLC

SIGNED AND SUBMITTED TO THE COURT FOR FILING BY RELIABLE ELECTRONIC MEANS

## APPLICATION FOR A SEARCH WARRANT

I, __Joshua C. Morrill__, a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

SEE ATTACHMENT A

located in the _____ District of __California__, there is now concealed

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

XX      evidence of a crime;
XX      contraband, fruits of crime, or other items illegally possessed;
XX      property designed for use, intended for use, or used in committing a crime;
          a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

18 U.S.C. § 1343, wire fraud, and 18 U.S.C. § 1349, conspiracy to commit wire fraud

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.

✓      Continued on the attached sheet.
❑      Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

I state under the penalty of perjury that the following is true and correct

JOSHUA MORRILL   Digitally signed by JOSHUA MORRILL
Date: 2025.10.07 11:32:17 -05'00'
_____
*Applicant's signature*
Joshua C. Morrill, SA, FBI

_____
*Printed name and title*

Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41.

Date: __October 7, 2025__

_____
*Judge's signature*

City and State: __St. Louis, Missouri__

Honorable Patricia L. Cohen, U.S. Magistrate Judge
*Printed name and title*
AUSA: GWENDOLYN CARROLL

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH **APPLE IDs:** **sachdevmonarch5@icloud.com and monarchdsachdev@icloud.com** THAT ARE STORED AT PREMISES CONTROLLED BY APPLE, INC. | No. 4:25 MJ 6199 PLC and 4:25 MJ 6200 PLC  **FILED UNDER SEAL**  SIGNED AND SUBMITTED TO THE COURT FOR FILING BY RELIABLE ELECTRONIC MEANS |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Joshua C. Morrill, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of applications for search warrants under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple Inc. (hereafter "Apple") to disclose to the government records and other information, including the contents of communications, associated with Apple ID sachdevmonarch5@icloud.com connected to DSID 10159429487 and Apple ID monarchdsachdev@icloud.com connected to DSID 20732569747 and Apple ID, both of which are stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at 1 Infinite Loop, Cupertino, CA.  The information to be disclosed by Apple and searched by the government is described in the following paragraphs and in Attachments A and B.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been employed with the FBI since February 2011. I am currently assigned to the St. Louis Division. In connection with my official FBI duties, I investigate criminal violations related to financial crime investigations. I have received specialized training in the enforcement of federal criminal laws, and

I have been involved in numerous aspects of financial crime investigations. I have also received training and participated in investigations involving the interception of both wire communication and electronic communications.

3.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1343, wire fraud, and 18 U.S.C. § 1349, conspiracy to commit wire fraud, have been committed by Raj Chauhan, Monarch Sachdev, and other persons known and unknown.  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6.      On September 17, 2024, information was received by the FBI from a precious metal and coin dealership located in the St. Louis area regarding a customer (herein referred to as "victim BK") whom the dealership believed was in process of being victimized through a scam involving gold. The precious metal and coin dealership reached this belief when victim BK contacted the dealership and emphasized the need for an urgent purchase of gold in the approximate amount of $197,000.

2

7.      On the same day, myself and another FBI agent met with and interviewed victim BK. During the interview, I learned that victim BK had recently received an email allegedly from Paypal which indicated victim BK had been charged approximately $500 to her Paypal account. The email included a telephone number to call if the charge was unwanted. Victim BK called the provided number and began a conversation with "Steven Williams," an individual who represented himself to be an employee of Paypal. According to victim BK, Williams had a foreign accent. Williams convinced victim BK to download and install a remote access software application onto her personal computer. Williams also purported to walk victim BK through a refund request on her Paypal account; however, during the process, the purported refund request was entered as a much higher dollar amount. Williams told victim BK this was a big mistake and that she would need to buy gold to refund the extra money that was sent to her in error. Further, Williams informed victim BK that her financial accounts may have also been compromised. Williams indicated he could connect victim BK with a worker in the fraud department of her financial institution.

8.      Victim BK explained to me that earlier that day on September 17, 2024, Williams introduced victim BK to "Josh" who purported to be with the fraud department at U.S. Bank. Josh also had a foreign accent. Josh provided information to victim BK on how to make the wire transfer to purchase the gold. Victim BK was also instructed that she should not log into her U.S. Bank account online for the next three to five days due to fraud precautions.

9.      I recognized the fact pattern provided by victim BK to be part of a multi-layered tech support, financial institution, and government imposter scam which typically originated from an overseas call center. I was also aware, based on my training and experience, that the next step in the scam would be to physically send a courier to a pre-arraigned location to pick up the gold from victim BK.

3

10.    Victim BK agreed to participate in a controlled delivery of sham gold to the anticipated courier. At the direction of the FBI, and during the morning of September 18, 2024, victim BK advised Williams she was in possession of the gold. As anticipated, Williams informed victim BK that an individual would be dispatched to come to her home that day to pick up the package. Based on this information, the FBI (to include myself) set up surveillance on the home of victim BK with the intent of completing a controlled delivery of the sham gold followed by a traffic stop of the courier. Throughout the day, victim BK stayed in communication with Williams. Williams provided regular updates on the progress of the courier's travel. Williams also informed victim BK the courier would be driving a black Lincoln SUV. Williams instructed victim BK to only give the package if the courier provided the name "Jack" and the secret word of "chocolate."

11.    At approximately 1:50 PM central, a black Lincoln Corsair bearing Illinois license plate 7872LY being driven by an Indian male arrived at the home of victim BK. Simultaneous to the arrival of the black Lincoln SUV, Williams informed victim BK the courier had arrived at her home. Sometime shortly thereafter, victim BK departed her residence, approached the SUV, and handed off the sham gold package to the Indian male. Prior to giving the sham gold package to the courier, the courier provided the name "Jack" and the passcode of "chocolate."

12.    After receiving the package, the Indian male departed the residence in the black Lincoln SUV. The FBI surveillance team followed the black Lincoln SUV to a nearby Walgreens parking lot. The black Lincoln SUV parked in the parking lot of the Walgreens, where a member of the FBI surveillance team observed the Indian male open the controlled package of sham gold.

13.    Shortly after opening the sham gold package, the Indian male departed the Walgreens parking lot in the black Lincoln SUV and began driving on a highway.  Shortly after the black Lincoln Corsair began driving on the highway, the SUV pulled over onto the shoulder

4

of the highway and stopped. The FBI surveillance team observed items flying out the passenger side window of the black Lincoln SUV and landing in the area by the roadside. As soon as the SUV departed, Agents recovered the contents thrown out the window. The items thrown out the window were identified as the contents of the sham gold package.

14.    A short time later, Agents (to include myself) conducted a vehicle traffic stop of the black Lincoln SUV on the side of the highway. At the time of the vehicle traffic stop, the Indian male driver of the black Lincoln SUV was temporarily detained. During a high-risk search of the vehicle, Agents located an iPhone 15 Pro Max and a Samsung Galaxy Z Flip 5.

15.    The Indian male driver of the black Lincoln SUV was informed he should only answer the logistical and biographical questions at this time. The driver identified himself as Raj Chauhan.  Despite the warning, Chauhan made the spontaneous statement that he had thrown the package out the window at the direction of another person whom he had been on the phone with.

16.    After being transferred to a safer location, the handcuffs were removed from Chauhan and I advised Chauhan that he was not under arrest. Prior to asking any questions and out of an abundance of caution, I provided Chauhan with his Miranda rights as memorialized on an FBI form FD-395. Chauhan was allowed ample time to read and review the form and to ask any questions. After reading and reviewing his rights, Chauhan told myself and another Agent he understood and was willing to waive his rights and make a statement. Chauhan documented his consent by signing the FD-395 in my presence. Chauhan was then interviewed by another Agent and me and provided the following information.

A.    Chauhan confirmed the cellular telephones located in the black Lincoln SUV belonged to him and agreed to provide written consent to allow investigators to image and review the contents of the cellular telephones. The Samsung Galaxy Z Flip 5 was

5

connected to telephone number 872-222-3170 and was connected to a WhatsApp account which he used to talk to people in India. The iPhone 15 Max Pro was connected to telephone number 332-201-2953. Chauhan documented his consent to search the phones and provided the PIN numbers for both phones on an FD-26, Consent to Search form.

B.      In summary, when asked about why he had come to the house today to picked up the package, Chauhan told us he ran a taxi business. Chauhan had been contacted on WhatsApp on the Samsung Galaxy Z Flip 5 by an individual named Ankur Desai within the past 30 to 40 days regarding his taxi business. Prior to this contact, Chauhan stated he did not know Desai. Chauhan told us he did not know any further details about Desai. Approximately two to three days ago, Chauhan received a message from Desai with a ZIP code near the house Chauhan went to today. Desai asked Chauhan if he would drive to the ZIP code to pick up Desai's grandmother and take her to the Chicago O'Hare International Airport (ORD) for $800, to which Chauhan agreed. At approximately 8:00 AM that morning on September 18, 2024, Chauhan received a message from Desai that he (Chauhan) needed to leave as soon as possible to pick up Desai's grandmother. Chauhan and Desai spoke and exchanged messages on WhatsApp on the Samsung Galaxy Z Flip 5 throughout the drive. During the conversations, Desai and Chauhan spoke Gujurati, which I know to be an Indo-Aryan language native to the Indian state of Gujarat.

C.      When Chauhan initially arrived at the residence, he was expecting for an elderly Indian woman to come outside. This was because he believed he was picking up Desai's grandmother and transporting her to ORD. Chauhan was confused when the female at the residence was Caucasian.

6

D.       After Chauhan arrived at the residence, a white, elderly female came outside and gave Chauhan a bag. Chauhan was told by Desai to leave the residence with the bag and drive away. Once down the road, Chauhan was instructed by Desai to pull into the Walgreens parking lot. Once parked in the parking lot, Chauhan was instructed by Desai to place his phone on record and record a video of himself opening the box. Chauhan began recording and placed his phone in the sun visor in a way the phone would record the box while it was opened. After opening the box, Chauhan told Desai the box had small black weights inside and sent the video to Desai. Desai told Chauhan he could throw the box and contents out the window and drive back home. Chauhan asked about his pay and Desai told Chauhan he would still be paid. Chauhan left the parking lot and threw the box out the window.

E.       Prior to being pulled over by law enforcement, Desai told Chauhan to delete all their WhatsApp messages, which Chauhan did. Chauhan did not have an explanation on why he was asked to do this nor why he followed through and did it.

F.       Throughout the course of the interview, I asked Chauhan numerous times if he had picked up packages on other occasions. Chauhan consistently told me that he had never been hired to pick up a package prior to this instance. It was normal for Chauhan to travel to pick up people. The first package ever picked up by Chauhan was today.

G.       After giving Chauhan the opportunity to explain what had occurred, I noted that Chauhan had excluded from his statement the detail of using a fake name and code word when picking up the package. When confronted with this information, Chauhan stated that he had received messages in WhatsApp from Desai directing him to say the name "Jack" and provide the password "chocolate." When Chauhan exited the vehicle and

7

met with the elderly female, Desai told him over the voice call on WhatsApp to say "Jack" and "chocolate."

H.    I also questioned Chauhan on why Desai – someone purported to be a stranger – would have trusted Chauhan to open a box that was believed to have nearly $200,000 in gold inside. Chauhan stated that he did not know why Desai would trust him to do this. Chauhan explained that based on the last name, Desai may have known someone in or known of Chauhan's family back in India. This may have given Desai confidence in trusting Chauhan. Chauhan was unable to explain this reason any further.

17.    Following the conclusion of the interview and based on the evidence available to investigators at the time, Chauhan was not placed under arrest and was allowed to leave.

18.    Agents were unable to obtain a useful extraction from the iPhone 15 Max Pro connected to telephone number 332-201-2953 but were able to obtain a successful extraction from the Samsung Galaxy Z Flip 5 connected to telephone number 872-222-3170. My review of the Samsung Galaxy Z Flip 5 revealed the following details relevant to the captioned investigation:

A.    I observed a message threat in WhatsApp with an individual named "Ankur Desai" using WhatsApp User Id 12028511211@s.whatsapp.net. The first WhatsApp message with Desai saved on the phone was on September 14, 2024. Between September 14, 2024, and September 18, 2024, numerous messages and voice calls were made between Desai and Chauhan; however, none of the content of the messages was saved on the phone. This observation would be consistent with Chauhan's statement that he deleted all the messages.

B.    I also located a WhatsApp message thread with an individual named    "Y M C M B 💰 " using WhatsApp User Id 919727682465@s.whatsapp.net. The first

8

WhatsApp message with Y M C M B saved on the phone was on September 16, 2024. On September 17, 2024, the following screen shot was sent from Y M C M B to Chauhan. The screen shot purported to capture a conversation between Y M C M B and an individual with a WhatsApp name of Ankur Desai. The profile picture of the Desai in the screen shot matched the profile picture of the individual with the same name whom Chauhan had also exchanged WhatsApp messages with.

C.      An FBI interpreter translated the phrase at the bottom of the message from Gujarati to English as, "Give this at a rate of 4 so [we] know how to write the accounts in a book."

D.      Based on past investigations dealing with gold bar scams, I believe the references to names, dates, and ounces in this message indicate the weight of gold previously defrauded from victims of a gold scam on certain dates by certain individuals. Specifically, the message would indicate an individual named "raj" worked with an individual named "Jack" on September 5, 2024, and September 9, 2024, to execute part of the gold scam. The message also indicated a second individual by the name "monarch" also worked with an individual named Jack on September 5, 2024, and September 12, 2024, to execute part of the gold scam.

E.      Also identified in the same WhatsApp thread between Y M C M B and Chauhan was a message received by Chauhan from Y M C M B on September 18, 2024, at around 12:21 PM central (approximately 30 minutes before the controlled gold pickup). The message contained a screen shot of a picture from a social media account tagged with an individual named Monarch Sachdev.

F.      I also located a three-way WhatsApp telephone call between Desai, Chauhan, and an individual named "Monarch Bhai Surti Khaman U.S.A 2" using WhatsApp User Id 13312669984@s.whatsapp.net. The call was initiated by Chauhan at 2:25 PM central – around three minutes before the car stop of Chauhan – and lasted for six minutes and 16 seconds. At the time of the traffic stop, an FBI agent involved in the traffic stop observed that one of the phones had been connected to an ongoing call, which was terminated by the Agent.

10

G.      Further analysis of Chauhan's phone revealed numerous text messages and phone calls between Chauhan and Monarch Bhai Surti Khaman U.S.A 2 on September 5, 2024. This was the same day noted in the message from Y M C M B that "raj" and "monarch" were involved in what investigators believe were gold pickups for 59 ounces and 28 ounces, respectively.

H.      In the same WhatsApp thread between Y M C M B and Chauhan, Chauhan received a message from Y M C M B on September 18, 2024 (the day of the controlled sham gold pickup in Missouri), at around 11:47 AM central containing the contact card for Tushar Rabari with WhatsApp User Id 918511224348@s.whatsapp.net. Within 30 seconds of receiving the contact card, Chauhan initiated a one minute and 14 second WhatsApp call with Rabari. Approximately 10 minutes later, a second WhatsApp call was initiated by Rabari to Chauhan which lasted for one minute and 11 seconds.

I.      I also located three videos on the cellular telephone which depicted Chauhan opening the sham gold package, consistent with Chauhan's statement that he had video recorded himself opening the package.

J.      I also located a photograph taken at 2:27 PM central, approximately one minute prior to the vehicle stop executed by the FBI. The photograph depicted an FBI vehicle which had pulled to the side of the road in preparation of the car stop.

19.     When Chauhan was interviewed following the vehicle stop, Chauhan made no mention of Y M C M B, Rabari, or Sachdev. Further, Chauhan made no reference to package pickups on September 5, 2024, or September 9, 2024. In contrast, Chauhan repeatedly told me that he had only worked with Desai related to the trip that day to transport Desai's grandmother and had never traveled to pick up a package before today.

11

20.    Based on this information, I obtained a search warrant for historical cell site information for the cellular telephone belonging to Chauhan. Upon reviewing and analyzing the returns for this search warrant, I learned the cellular telephone belonging to Chauhan connected to cellular towers in a way to indicate the cellular telephone traveled from the area of Chicago, Illinois to St. Louis, Missouri, and then back to Chicago, Illinois on September 5, 2024.

21.    On September 11, 2024, victim C.T., a resident of St. Louis, Missouri, came to the offices of the FBI in St. Louis, Missouri to report that she had been the victim of a gold scam. More specifically, victim CT was victimized through a law-enforcement impersonation scam which resulted in the victim liquidating financial accounts to purchase gold, like victim BK. Victim CT told Agents she had purchased 28 ounces of gold for $71,120, and provided the gold to a courier on September 5, 2024, in the parking lot of a Target store in St. Louis, Missouri at approximately 6:00 PM. I have since confirmed the 28-ounce gold purchase with the gold dealership in St. Louis, Missouri. I also noted that at 5:50 PM CDT, the cellular telephone belonging to Chauhan made an approximate four-minute telephone call to the subject phone. For this telephone call, the cellular telephone belonging to Chauhan connected to a cell tower approximately 2.7 miles away from the Target store in St. Louis. Based on the message stating "5 sep – 28 oz – ?", the identification of victim C.T. who was defrauded out of 28 ounces of gold on September 5, 2024 in St. Louis, Missouri, and the pattern of Chauhan's cellular telephone connecting to cellular towers on September 9, 2024, there is probable cause to believe Chauhan was the courier who picked up the 28 ounces of gold from victim C.T. at the Target store in St. Louis, Missouri and the message "5 sep – 28 oz – ?" was related to the payment for this pickup. Based on the four- minute telephone call between the cellular telephone belonging to Chauhan and

the subject phone, which occurred within a few minutes before the gold pickup, it is also likely Sachdev had some knowledge or involvement in the gold pickup.

22.     In reviewing the search warrant return for the search warrant for historical cell site information for the cellular telephone belonging to Chauhan, I also learned the cellular telephone belonging to Chauhan connected to a cellular tower in the area of Sellersburg, Indiana at approximately 6:04 PM EDT on September 9, 2024, followed by connecting to two cellular towers a short time later in a way to indicate the cellular telephone was traveling northbound on I-65 in the direction of Chicago, Illinois. The cellular telephone belonging to Chauhan later connected to a cellular tower in Chicago, Illinois at 8:54 PM CDT on September 9, 2024. Based on the message stating "9 sep – 108 oz – ?" and the pattern of Chauhan's cellular telephone connecting to cellular towers on September 9, 2024, there is probable cause to believe that an additional gold pickup was conducted by Chauhan on September 9, 2024 in the area of southern Indiana or in Kentucky. The investigation has not yet identified a victim of the gold pickup. Given the closing price for gold on September 9, 2024, of approximately $2,506, the value of 108 ounces of gold would have been approximately $270,000.

23.     As the investigation established probable cause to demonstrate the message between Ankur Desai and Y M C M B which referenced "raj" was related to payment for the gold pickups conducted by Chauhan, I also believe the reference to "monarch" in the same message is related to the payment for gold pickups conducted by Sachdev on September 5, 2024, and September 12, 2024 at unknown locations.

24.     Upon reviewing FBI internal records, I located a complaint involving victim RM, a resident of Colorado Springs, Colorado. According to information from the victim, victim RM was defrauded out of approximately $300,000 through a gold bar scam in February 2024. Victim

13

RM delivered the gold to three different couriers and took pictures of each courier. I have reviewed the photographs of the couriers, and one of the three couriers appeared to be Sachdev.

25. On July 8, 2025, I obtained a federal search warrant for historical cell site information for the telephone number (331) 266-9984. Upon reviewing the information returned by the service provider, I learned the telephone number is registered to Monarch Sachdev with the contact email address of monarchdsachdev@icloud.com. Further, I observed that the cellular telephone connected to telephone number (331) 266-9984 connected to cellular towers in a way which indicted the cellular telephone frequently traveled throughout the country.

26. Specifically, the cellular telephone connected to telephone number (331) 266-9984 was in Colorado Springs, Colorado on February 9, 2024. This was the same time frame in which victim RM was victimized.

27. The cellular telephone connected to telephone number (331) 266-9984 connected to cellular towers in the general area of Marshall, Texas on September 5, 2024, and Williamsburg, Florida on September 12, 2024. These were the two dates referenced in the text message that indicated an individual by the name "monarch" worked with an individual named Jack on September 5, 2024, and September 12, 2024, to execute part of the gold scam. To date, I have been unsuccessful in locating a victim in or around those locations on those dates.

28. Pursuant to legal processes, I have determined that between the dates of January 3, 2024, and May 28, 2025, over 30 flights were purchased in the name of Sachdev through United Airlines. Specifically, Sachdev flew from Houston, Texas (his city of residence) to Tampa, Florida on September 12, 2024. The email provided to United Airlines for this flight purchase was monarchdsachdev@icloud.com. Pursuant to legal process, I have also determined that between the dates of November 25, 2023, and May 29, 2025, over 50 vehicles from Enterprise Rent-A-Car

14

were rented to Sachdev. Specifically, Sachdev rented a gray 2023 Hyundai Sonata on September 12, 2024, from the Enterprise Rent-A-Car located at the Tampa International Airport. The email provided to Enterprise Rent-A-Car for this vehicle rental was also monarchdsachdev@icloud.com. The date of the flight to and car rental in Tampa, Florida was the same date Sachdev's cellular telephone connected to cellular towers in the area of Williamsburg, Florida.

29.    Pursuant to legal processes, I have determined that Sachdev had two Apple iCloud accounts. The first iCloud account is under the Apple ID sachdevmonarch5@icloud.com with a DSID of 10159429487. The subscriber information for this account is registered to Monarch Dharmesh Sachdev. The signup for the account was in 2016 and was connected to the telephone number (958) 661-0474 through the country of India. The second iCloud account is under Apple ID monarchdsachdev@icloud.com with a DSID of 20732569747. The subscriber information for this account is registered to Monarch Dharmesh Sachdev. The signup for the account was in 2022 and was connected to telephone number (331) 266-9984, the same number utilized to communicate with Chauhan. According to the subscriber information obtained from Apple, Inc., both iCloud accounts connected to Sachdev were active and utilized during the times relevant in this affidavit. For example, the iCloud account connected to sachdevmonarch5@icloud.com recorded a sign-on on July 16, 2024, September 20, 2024, and September 25, 2024; and the iCloud account connected to monarchdsachdev@icloud.com recorded a sign-on on July 11, 2024, July 22, 2024, August 29, 2024, September 5, 2024, and September 25, 2024.

## INFORMATION REGARDING APPLE ID AND iCLOUD[1]

30.    Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

31.    Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps").  As described in further detail below, the services include email, instant messaging, and file storage:

a.    Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.    iMessage and FaceTime allow users of Apple devices to communicate in real-time.  iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

c.    iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.

---

[1]    The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at http://images.apple.com/privacy/docs/legal-process-guidelines-us.pdf; "Create and start using an Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; "iOS Security," available at https://www.apple.com/business/docs/iOS_Security_Guide.pdf, and "iCloud: How Can I Use iCloud?," available at https://support.apple.com/kb/PH26502.

d.      iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device.  For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com.  iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers.  iCloud Drive can be used to store presentations, spreadsheets, and other documents.  iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices.  iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations.  iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

e.      Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

f.      Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices.  Find My Friends allows owners of Apple devices to share locations.

g.      Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

h.      App Store and iTunes Store are used to purchase and download digital content.  iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS.

17

Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

32. Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

33. An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

34. Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and

utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

35.     Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

36.     Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

19

37.     Apple provides users with free electronic space on iCloud, and users can purchase additional storage space.  That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain).  iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data.  Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive.  Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

38.     In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

39.     For example, a more precise location data of where Sachdev was during the period of September 5, 2024, and September 12, 2024, may be retained in the iCloud account connected to the Apple ID and would provide direct evidence of the offenses under investigation. This evidence may assist in identifying victims on these days, as well as other victims.

40.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

41.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

42.     Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, emails, iMessages, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of additional evidence of the offenses under investigation.

43.     Therefore, Apple's servers are likely to contain stored electronic communications and information concerning Sachdev's and his use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation.

21

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

44.     I anticipate executing these warrants under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrants to require Apple to disclose to the government copies of the records and other information (including the content of communications and stored data) particularly described in Section I of Attachment B.   Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

**CONCLUSION**

45.     Based on the forgoing, I believe there is probable cause to support search warrants to search the iCloud accounts belonging to Sachdev, and as such, respectfully request that the Court issue the proposed search warrants.

46.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of the warrants.

**REQUEST FOR SEALING**

47.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrants, be sealed until further order of the Court.   These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.   Accordingly, there is good cause to seal these documents because

their premature disclosure may seriously jeopardize that investigation.

I state under the penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

**JOSHUA MORRILL**
Digitally signed by JOSHUA
MORRILL
Date: 2025.10.07 11:33:51 -05'00'

Joshua C. Morrill
Special Agent
Federal Bureau of Investigation

Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41 on October ___7___, 2025

PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

23

**<u>ATTACHMENT</u>**

**<u>4:25 MJ 6200 PLC</u>**

**Property to Be Searched**

This warrant applies to information associated with monarchdsachdev@icloud.com (the "account") that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at Apple Inc., 1 Infinite Loop, Cupertino, CA 95014.

**ATTACHMENT B**

**4:25 MJ 6199 and 6200 PLC**

**Particular Things to be Seized**

I.      **Information to be disclosed by Apple**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Apple, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose the following information to the government, in unencrypted form whenever available, for each account or identifier listed in Attachment A:

a.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.      All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers

2

("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

c.      The contents of all instant messages associated with the account from January 2023 through present, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

d.      The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

e.      All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps),

3

My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

f.      All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

g.      All records pertaining to the types of service used; and

h.      All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

The Provider is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.

4

**II.    Information to be seized by the government**

All information described above in Section I that constitutes evidence and/or instrumentalities of violations of 18 U.S.C. § 1343, wire fraud, and 18 U.S.C. § 1349, conspiracy to commit wire fraud, involving Monarch Sachdev since January 1, 2024, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.    The identity of the person(s) who created or used the Apple ID, including records that help reveal the whereabouts of such person(s);

b.    Evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use and events relating to the crime under investigation and the account subscriber;

c.    Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

d.    Evidence indicating the subscriber's state of mind as it relates to the crime under investigation, any preparatory steps taken in furtherance of the scheme, and any acts taken in furtherance to cover up the scheme; and

e.    Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts.

5

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.